SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**State v. Craig Szemple** (A-70-19) (084182)

**Argued March 2, 2021 -- Decided June 23, 2021**

**SOLOMON, J., writing for the Court.**

The Court considers whether the State can be compelled to search its file to determine the existence of information in this post-conviction context, where defendant Craig Szemple seeks to obtain any statements or reports memorializing any interviews with his ex-wife, Theresa Boyle, that may have occurred after a letter admitting to the 1975 murder of Nicholas Mirov, believed to be written by defendant, was produced by Theresa's father in 1992, during defendant's first trial for Mirov's murder.

Mirov disappeared in 1975, and defendant told members of Mirov's family that he had driven Mirov to a bus station so that Mirov could go to New York City. Four months after Mirov disappeared, police discovered a body in the woods. Police did not identify the body until sixteen years later, when defendant's brother, under questioning about a different homicide, revealed defendant's prior admission to killing Mirov.

During defendant's first trial, defendant's father-in-law, Michael Boyle, provided the State with the letter he claimed to have discovered in April 1991 while helping his daughter move out of the home she had shared with defendant until his arrest for a different murder. The letter reads in part: "My first hit was an act of treachery, the ultimate deceit. 4 bullets in the back 1 in the neck and a broken promise made at the parting of the oncoming river."

Defendant's first trial ended in a mistrial, and he was re-tried in 1994. The State admitted into evidence the letter, testimony by a handwriting expert that defendant authored the letter, the .32 caliber bullets found lodged in the victim's neck and the base of the tree where the victim's remains were found, and the testimony of defendant's brother that (a) his family kept a .32 caliber handgun in the family store where defendant worked, and (b) that defendant confessed to shooting the victim. Defendant was convicted of first-degree murder.

After an unsuccessful direct appeal, defendant filed a for post-conviction relief (PCR) in 1999, alleging ineffective assistance of counsel and arguing that trial counsel failed to hire a handwriting expert and neglected to test for fingerprints or DNA on the

1

letter.  The PCR court denied defendant's petition, finding trial counsel was a highly experienced criminal attorney who chose to impeach the letter as a forgery and not seek expert opinions that may have implicated defendant.

In 2016, nearly twenty-five years after disclosure of the letter and defendant's conviction, defendant's attorney wrote to the Morris County Prosecutor's office requesting copies of any statements or reports memorializing interviews with Theresa following Michael's production of the letter.  The State responded that defendant had no right to post-conviction discovery.  More than two years after the State's response, and twenty-seven years after disclosure of the letter, defendant filed what he titled "Notice of Motion to Compel Disclosure of Exculpatory Evidence Necessary for Defendant to File a Motion for a New Trial" in December 2018.  Defendant claimed that good cause existed to compel the State to produce any requested statements or reports that might exist because, in 1991, three years before defendant's re-trial, detectives interviewed Theresa regarding an unrelated investigation of a business defendant owned.

Noting that the State had provided defendant with a redacted nine-page copy of Theresa's 1991 interview in post-indictment discovery, the court denied defendant's request, which the court treated as "a second petition for post-conviction relief" and found that it was procedurally barred by Rule 3:22-4.  The court also acknowledged that defendant's motion could be construed as a motion for a new trial based on newly discovered evidence, which may be filed at any time; citing State v. Marshall, 148 N.J. 89 (1997), however, the court held that defendant failed to establish good cause to compel discovery.  The Appellate Division reversed and remanded.  Relying on Rule 3:13-3(b)(1)(F) and (G) and the constitutional requirement to disclose exculpatory evidence under Brady, the Appellate Division held that the State is obligated to produce discovery beyond defendant's conviction.  The Court granted certification.  241 N.J. 520 (2020).

**HELD:**  Because defendant was aware of the letter and the circumstances relevant to this appeal for nearly twenty-five years, yet provides no evidence -- and made almost no effort to uncover evidence -- that police interviewed Theresa after production of the letter, the trial court did not abuse its discretion in denying defendant's post-conviction discovery request.

1.  The Court notes the extraordinary nature of the motion at issue, which is premised on defendant's claim that, because detectives interviewed Theresa before his trial regarding an unrelated matter involving a business that he owned, the State should be compelled to search its file for evidence that officers interviewed Theresa after production of the letter.  Significantly, defendant knew of the first interview before his trial.  He therefore had all of the information on which he now predicates his discovery request prior to his trial, and Rule 3:13-3(f) would have provided a ready remedy, had his motion been made at trial.  Moreover, defendant could have made the present inquiry at any time since trial, but he

failed to raise the issue presented here in either his direct appeal or in his 1999 PCR petition, even though they focused on the letter. (pp. 13-14)

2. It is true that, if such a second interview took place, the State would have been obliged to include any record made of it among its other automatic post-indictment materials pursuant to Rule 3:13-3(b)(1)(F) and (G). And, if the interview took place and was exculpatory, its disclosure would have been mandatory under both Brady and Rule 3:13-3(b)(1). The continuing duty to disclose such materials imposed by Rule 3:13-3(f), however, ends with a defendant's conviction. Requests for discovery made post-conviction -- even if the requested materials should have been turned over automatically post-indictment -- are not granted automatically under either the Court Rules or Brady. Rather, post-verdict discovery requests fall within the discretion of the trial court: a trial court's inherent power to order discovery extends to post-conviction proceedings "when justice so requires," Marshall, 148 N.J. at 269, but courts invoke that discretion "only in the unusual case," id. at 269-70, in recognition of the importance of finality, see id. at 152. Here, defendant argues that this discovery motion should be analyzed differently because it is a motion in anticipation of a new trial rather than a PCR petition. The Court therefore reviews the relevant standards. (pp. 15-17)

3. PCR is New Jersey's equivalent of the federal writ of habeas corpus. Under Rule 3:22-4(b)(2)(B), even a timely second or subsequent PCR petition "shall be dismissed unless . . . it alleges on its face . . . that the factual predicate for the relief sought could not have been discovered earlier through the exercise of reasonable diligence, and the facts underlying the ground for relief, if proven and viewed in light of the evidence as a whole, would raise a reasonable probability that the relief sought would be granted." Although procedural roadblocks may be relaxed to avoid fundamental injustice, the Court has repeatedly emphasized that doing so requires balancing the competing interests of finality and fundamental fairness. Unlike petitions for post-conviction relief, "[a] motion for new trial based on the ground of newly-discovered evidence may be made at any time." R. 3:20-2. But like a petition for PCR, the movant seeking a new trial based on newly discovered evidence must demonstrate that the evidence is, indeed, newly discovered. A new trial is warranted only if the evidence is (1) material to the issue and not merely cumulative or impeaching or contradictory; (2) discovered since the trial and not discoverable by reasonable diligence beforehand; and (3) of the sort that would probably change the jury's verdict if a new trial were granted. (pp. 17-21)

4. Comparison of the PCR petition and new trial motion standards reveals that, although the trial court incorrectly categorized defendant's motion as a second PCR petition, the motion must fail because defendant cannot satisfy the "reasonable diligence" requirement common to both motions. Nor has defendant made any showing that discovery should be granted in the interest of justice because a record of the hypothetical interview might constitute exculpatory evidence. Courts would not require a person who is probably innocent to languish in prison because the exculpatory evidence was discoverable and

3

overlooked, but a post-conviction request for even purported Brady materials must make a threshold showing that the requested materials are, in fact, Brady materials. Here, defendant has not made the requisite showing that the requested material should be considered as Brady material. (pp. 21-25)

5. Under the unusual circumstances presented here, the Court finds defendant's failure to satisfy the requirements of Rule 3:20-2 -- the motion in support of a new trial that would be the ultimate use to which any interview-related discovery would be put -- sufficient to resolve the matter. There is no freestanding right to post-verdict discovery under the Court Rules, and so analysis of any motion for such discovery must therefore necessarily consider the proposed use to which the discovery would be put. If it is impossible for defendant to prevail on his ultimate claim for relief -- even should the requested discovery prove favorable to his cause -- then there is no need to separately analyze the discovery request, as the Court of Appeals for the Tenth Circuit held in United States v. Silva-Arzeta, 602 F.3d 1208, 1218-19 (10th Cir. 2010). The Court reviews that case in detail and similarly finds that granting defendant's discovery motion here "would be a useless act" because he cannot possibly satisfy the "reasonable diligence" prong of the standard for a new trial based on newly discovered evidence. In sum, although the trial court erred in labeling defendant's motion as a PCR petition, the motion can fare no better under the standard for new trials because, when such a motion is based on "newly discovered evidence," a defendant must show "reasonable diligence." (pp. 25-28)

6. For completeness, the Court reviews jurisprudence governing post-trial discovery motions. In Marshall, the Court considered under what standard a request for discovery made in connection with a PCR petition should be evaluated to determine whether a particular case was an "unusual case" in which a post-conviction discovery request should be granted. See 148 N.J. at 270. Defendant challenges the applicability of the Marshall standard in the non-PCR context of his motion for discovery that might support a new trial. The Court finds defendant's challenge unpersuasive. It is appropriate to turn to the standard applied to discovery requests in the PCR setting for guidance in the motion-for-a-new-trial context, given the lack of caselaw specific to this circumstance and the "reasonable diligence" requirement shared by the standards. (pp. 29-30)

7. In Marshall, the Court held that "where a defendant presents the PCR court with good cause to order the State to supply the defendant with discovery that is relevant to the defendant's case and not privileged, the court has the discretionary authority to grant relief." Ibid. (emphasis added). "[A]nticipat[ing] that only in the unusual case will a PCR court invoke its inherent right to compel discovery," the Marshall court did not define the "good cause" standard it adopted, ibid., but other jurisdictions have observed that a showing of good cause entails more than a generic demand for potentially exculpatory evidence. Without expressly invoking the good cause standard, the Court reached a similar conclusion in State v. Herrerra, 211 N.J. 308 (2012). (pp. 30-33)

4

8.  This case is not the "unusual case" contemplated in <u>Marshall</u>.  Defendant knew not only about the letter but also that Theresa had been interviewed about an unrelated crime involving defendant decades before filing his motion.  And, although the discovery sought here is far more limited than in <u>Marshall</u> and <u>Herrerra</u>, the letter's admissibility was heavily litigated.  Defendant has also made virtually no effort to investigate his claim that detectives spoke to Theresa after disclosure of the letter.  As the trial court aptly concluded, this might be a different case had defendant presented a certification that detectives interviewed Theresa after production of the letter.  In the absence of such evidence, however, and based on the circumstances in this case, defendant fails to make the necessary showing of good cause under <u>Marshall</u>.  In <u>Herrerra</u>, moreover, the Court observed that given the stage of the proceedings -- "nearly twenty years after the offense and almost seventeen years since the jury's verdict" -- the defendants would face the additional challenge of showing that any newly discovered evidence "would probably change the jury's verdict if a new trial were granted."  211 N.J. at 343.  That observation applies with greater force here -- forty-six years after the offense and twenty-seven years since the jury's verdict.  And, as stressed in <u>Herrerra</u>, there were "strong corroborative proofs" in this record.  <u>See</u> <u>ibid.</u>  In sum, the trial court's decision to deny defendant's request was thus not an abuse of discretion.  (pp. 34-38)

**The judgment of the Appellate Division is REVERSED.**

**JUSTICE ALBIN, dissenting,** would grant the particularized request for post-conviction discovery in this case, which, the dissent explains, would be clearly consistent with the Court's jurisprudence.  In Justice Albin's view, this case is not about the finality of judgments -- defendant has not filed a PCR petition or motion for a new trial -- but simply whether, in this post-conviction setting, defendant may have access to a critical piece of evidence -- if it exists -- that either the State already turned over as part of its original discovery obligation under <u>Rule</u> 3:13-3 or failed to turn over in violation of that discovery rule.  Justice Albin notes that the confession letter allegedly written by defendant was perhaps the most important piece of evidence introduced at trial and that defense counsel made a targeted, reasonable request for post-conviction discovery -- the type of discovery request expressly approved of in <u>Marshall</u>, 148 N.J. at 269-71.  Noting the minimal burden the discovery request placed on the State here, Justice Albin cautions that a system of post-conviction relief cannot fulfill its true purpose if reasonable, relevant, and non-burdensome requests for discovery can be thwarted by a prosecutor's office intent on keeping from view discovery that was or should have been available pretrial.  Justice Albin writes that defendant has presented "good cause" for the entry of an order requiring the Prosecutor's Office to respond to the limited request for discovery.

**JUSTICES PATTERSON, FERNANDEZ-VINA, and PIERRE-LOUIS join in JUSTICE SOLOMON's opinion.  JUSTICE ALBIN filed a dissent, in which CHIEF JUSTICE RABNER and JUSTICE LaVECCHIA join.**

# SUPREME COURT OF NEW JERSEY
## A-70 September Term 2019
## 084182

State of New Jersey,

Plaintiff-Appellant,

v.

Craig Szemple,

Defendant-Respondent.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
|--------|---------|
| March 2, 2021 | June 23, 2021 |

John McNamara, Jr., Chief Assistant Prosecutor, argued
the cause for appellant (Robert J. Carroll, Acting Morris
County Prosecutor, attorney; John McNamara, Jr., on the
briefs).

Paul Casteleiro argued the cause for respondent (Paul
Casteleiro, on the briefs).

Paul H. Heinzel, Somerset County Assistant Prosecutor,
argued the cause for amicus curiae County Prosecutors
Association of New Jersey (Esther Suarez, President,
County Prosecutors Association of New Jersey, attorney;
Paul H. Heinzel, of counsel and on the brief).

1

Carol M. Henderson, Assistant Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Gurbir S. Grewal, Attorney General, attorney; Carol M. Henderson, of counsel and on the brief).

Hannah M. Thibideau, of the New York bar, admitted pro hac vice, argued the cause for amici curiae the Innocence Project and the Exoneration Initiative (Donald Yannella and Schulte Roth & Zabel, attorneys; Donald Yannella, Hannah M. Thibideau, Gary Stein, of the New York bar, admitted pro hac vice, and Amanda B. Barkin, of the New York bar, admitted pro hac vice, on the brief).

JUSTICE SOLOMON delivered the opinion of the Court.

Nicholas Mirov disappeared in 1975. Four months after his disappearance, police discovered a body in the woods. Police did not identify the body until 1991, after defendant's brother, when questioned about a separate homicide, revealed that defendant Craig Szemple had admitted to killing Mirov.

Defendant was charged in 1991 with the first-degree murder of Mirov. At his first trial in 1992, after the State rested, Michael Boyle (Michael), defendant's then father-in-law, produced a letter (the Boyle letter or the letter) believed to be written by defendant to his then-wife, Theresa Boyle Szemple (Theresa), admitting to Mirov's murder. Michael gave the letter to the prosecutor, who turned it over to the court and defendant. The trial judge admitted the Boyle letter into evidence over defendant's objection. The trial

2

ended in a mistrial but, following a retrial, the jury convicted defendant of first-degree murder, and the court imposed a sentence of life imprisonment.

In 2018, forty-three years after Mirov's murder and nearly twenty-five years after defendant's conviction, defendant moved to compel the State to produce any statements or reports memorializing interviews with Theresa following her father's production of the letter. In doing so, defendant claimed the discovery sought might support a motion for a new trial.

The motion court characterized defendant's request as "a second petition for post-conviction relief" and therefore barred by Rule 3:22-4. The Appellate Division reversed, concluding that the State's obligation to produce discovery continued post-conviction under Rule 3:13-3(b)(1)(F) and (G) and the constitutional requirement to disclose exculpatory evidence under Brady v. Maryland, 373 U.S. 83 (1963).

In this appeal, we are called upon to determine whether the State can be compelled to search its file to determine the existence of information in this post-conviction context. Because defendant was aware of the Boyle letter and the circumstances relevant to this appeal for nearly twenty-five years, yet provides no evidence -- and made almost no effort to uncover evidence -- that police interviewed Theresa after production of the letter, we find that the trial court did not abuse its discretion in denying defendant's post-conviction

3

discovery request. We therefore reverse the judgment of the Appellate Division requiring that the State comply with defendant's discovery request.

## I.

The trial, appellate, and PCR records reveal that Nicholas Mirov disappeared in 1975. Shortly after he went missing, defendant told members of Mirov's family that he had driven Mirov to a bus station so that Mirov could go to New York City. Four months after Mirov disappeared, police discovered a body in the woods, partially covered by a tarp. Police did not identify the body until sixteen years later, when defendant's brother, under questioning about a different homicide, revealed defendant's prior admission to killing Mirov.

A Morris County grand jury indicted defendant in 1991 for the first-degree murder of Mirov.[1] During defendant's first trial, after the State rested its case, defendant's father-in-law, Michael, provided the State with the letter he claimed to have discovered in April 1991 while helping his daughter move

---

[1] In addition to murder, defendant was indicted under the relevant pre-Code of Criminal Justice statutes for possession of a firearm without a permit and murder while armed. The latter two counts were dismissed prior to defendant's first trial in 1992.

4

out of the home she had shared with defendant until his arrest for a different murder in Warren County.[2]  The Boyle letter reads in part:

> My first hit was an act of treachery, the ultimate deceit. 4 bullets in the back 1 in the neck and a broken promise made at the parting of the oncoming river.  I never did tell his mother what happened to him.  The second I pulled that trigger I became larger than death to all of my associates.  CFS passed into a league as he left his "punk" former do or die buddies for bigger and better.

The State moved to reopen its case and present the Boyle letter, as well as an admission made by defendant while in jail to a Minister of Visitation.[3]  Defendant argued that the marital-communications privilege barred the Boyle letter and that the priest-penitent privilege barred his admission to the Minister of Visitation.  The trial court rejected defendant's arguments and granted the

---

[2]  In addition to the Morris County indictment, defendant was indicted for other murders in both Hudson and Warren Counties.  The Hudson County indictment charged defendant with the 1977 murder of Juanita Simmons, a prostitute, whom defendant strangled to death with a piece of clothesline before dumping her body in Jersey City.  See State v. Szemple, 151 N.J. 76 (1997) (denying certification in that case).  The Warren County indictment charged defendant with eighty-one counts, including murder.  See State v. Szemple, 332 N.J. Super. 322, 327 (2000).  Defendant ultimately pled guilty to aggravated manslaughter, theft by deception, and attempted theft by deception.  Id. at 324.  Defendant was sentenced to life imprisonment with a twenty-five-year parole bar for manslaughter, to be served concurrent to defendant's sentence for the Hudson County murder but consecutive to the Morris County murder sentence related to this appeal.  Id. at 326.

[3]  Defendant admitted to the minister during a jail visit that he had killed "not one but three."  State v. Szemple, 263 N.J. Super. 98, 100 (1993).

State's motion to admit into evidence both admissions. Claiming unfair surprise, defendant then moved for mistrial, which the trial court denied.

"On interlocutory appeal, the Appellate Division reversed the trial court's denial of defendant's motion for a mistrial" but upheld the trial court's evidentiary rulings over a dissent. State v. Szemple, 135 N.J. 406, 411 (1994).[4] Upon defendant's appeal as of right, we affirmed his conviction. Ibid.

At defendant's re-trial in 1994, the State admitted into evidence the Boyle letter, testimony by a handwriting expert that defendant authored the Boyle letter, the .32 caliber bullets found lodged in the victim's neck and the base of the tree where the victim's remains were found, and the testimony of defendant's brother that (a) his family kept a .32 caliber handgun in the family store where defendant worked, and (b) that defendant confessed to shooting the victim.[5] The testimony of defendant's brother included that defendant -- during the middle of the summer in 1975, and without making specific reference to the victim -- asked him whether shooting someone twelve times would kill them or not, and whether covering a body with lime or a tarp would

---

[4] As discussed infra Section IV.2, the letter's admissibility was heavily litigated over twenty-five years ago, the subject of an interlocutory appeal, defendant's direct appeal, and defendant's first PCR.

[5] The State did not offer at re-trial the testimony of the Minister of Visitation.

impact decomposition. Later that summer, defendant admitted to his brother that he had lured Mirov into the woods, shot him six times, reloaded, and shot again; that he had to kill the victim because he owed the victim too much money; and that if he, defendant's brother, did not watch his step, he would "take a ride like Nicky did."

The jury convicted defendant of first-degree murder, and he received a life sentence. The Appellate Division affirmed in 1997, and we denied certification. State v. Szemple, 151 N.J. 76 (1997).

After his unsuccessful direct appeal, defendant filed a pro se petition for post-conviction relief (PCR) in 1999, alleging ineffective assistance of counsel and arguing that his trial counsel's loss of confidence in his innocence amounted to ineffective assistance of counsel. Defendant further argued that trial counsel failed to hire a handwriting expert and neglected to test for fingerprints or DNA on the Boyle letter. The PCR court denied defendant's petition without an evidentiary hearing, finding trial counsel was a highly experienced criminal attorney who chose to impeach the letter as a forgery and not seek expert opinions that may have implicated defendant; the Appellate Division affirmed, and this Court denied certification. State v. Szemple, 208 N.J. 369 (2011).

7

In 2016, nearly twenty-five years after disclosure of the Boyle letter and defendant's conviction, defendant's attorney wrote to the Morris County Prosecutor's office requesting copies of any statements or reports memorializing interviews with Theresa following Michael's production of the Boyle letter.  The State responded that under State v. Marshall, 148 N.J. 89 (1997), defendant had no right to post-conviction discovery.

More than two years after the State's response, and twenty-seven years after disclosure of the Boyle letter, defendant filed what he titled "Notice of Motion to Compel Disclosure of Exculpatory Evidence Necessary for Defendant to File a Motion for a New Trial" in December 2018.  Defendant claimed that good cause existed to compel the State to produce "any and all notes, reports, statements or other type of writings memorializing any interviews, talks, discussions, etc., with Theresa Boyle following the June 24, 1992 production of [the Boyle] letter . . . through the conclusion of defendant's trial in July, 1994," because, in 1991, three years before defendant's re-trial, detectives interviewed Theresa regarding an unrelated investigation of a business defendant owned.  Noting that the State had provided defendant with a redacted nine-page copy of Theresa's 1991 interview in post-indictment discovery, the court denied defendant's request.

8

Emphasizing the need for finality, the court viewed defendant's motion as "a second petition for post-conviction relief" and found that it was procedurally barred by Rule 3:22-4 because defendant could have raised the issue in his first PCR petition but neglected to do so. The court also acknowledged that defendant's motion could be construed as a motion for a new trial based on newly discovered evidence, which may be filed at any time; citing Marshall, however, the court held that defendant failed to establish good cause to compel discovery.

The Appellate Division reversed and remanded, concluding that the trial court mistakenly exercised its discretion in treating defendant's motion as a second PCR application and thus procedurally barred. Relying on Rule 3:13-3(b)(1)(F) and (G) and the constitutional requirement to disclose exculpatory evidence under Brady, the Appellate Division held that the State is obligated to produce discovery beyond defendant's conviction. Addressing Marshall, the court stated "defendant need not show good cause to obtain discovery that the State was required to tender pre-trial. That standard is applicable to PCR matters; this is not one."

We granted the State's petition for certification to consider whether defendant is entitled to compel the State to comply with his post-conviction discovery request. 241 N.J. 520 (2020). We also granted amicus curiae status

9

to the County Prosecutor's Association of New Jersey (CPANJ), the Attorney General of New Jersey (Attorney General), and the Innocence Project and Exoneration Initiative (Innocence Project).

## II.

## A.

Before this Court, the State argues a defendant generally has no right to discovery in post-conviction proceedings. According to the State, Marshall articulates that "the reach of the continuing duty to disclose in Rule 3:13-3(g),[6] does not extend beyond the verdict." The State maintains that holding otherwise would "run[] counter to the judicial policy to foster finality after a full and fair consideration of a defendant's conviction and sentence."

The State also emphasizes that defendant failed to support the existence of exculpatory evidence contained in his discovery request. Relying on State v. Herrerra, 211 N.J. 308 (2012), the State argues that such discovery requests should not be granted merely because the possibility exists that discovery may be helpful to the defense.

Finally, the State argues the trial court appropriately treated defendant's request as a second PCR petition, and therefore procedurally barred by Rule

---

[6] On January 1, 2013, Rule 3:13-3 was amended and paragraph (g) was renumbered as paragraph (f).

10

3:22-4(b), because defendant could have raised his discovery argument in his first PCR petition but failed to do so.

Amicus CPANJ argues, like the State, that no abuse of discretion resulted from the trial court's decision to treat defendant's motion as a second PCR. According to CPANJ, the trial court appropriately exercised its broad discretion to reject defendant's motion on procedural grounds. CPANJ characterizes defendant's motion as speculative and, given the "total absence of facts" supporting defendant's application, CPANJ argues the trial court would have abused its discretion had it granted defendant's motion. Moreover, CPANJ asserts that under Marshall "the general discovery obligations contained in the Rules Governing Criminal Practice . . . do not extend to post-conviction proceedings."

The Attorney General contends the Appellate Division misapplied the discovery rule, therefore imposing on the State a post-conviction discovery obligation that is contrary to existing law. Relying on Marshall, the Attorney General reiterates that the opportunity for post-conviction discovery is discretionary and limited to instances where a defendant makes the required showing of good cause. According to the Attorney General, no such showing has been made here. Furthermore, the Attorney General argues that, while the Due Process Clause requires that the State disclose exculpatory evidence

11

within its possession, it does not require that the State turn over its entire file upon request.

B.

Defendant argues that Rule 3:13-3 and Brady obligate the State to provide the requested discovery. Defendant further argues the discovery request is limited to one specific witness and a specific time period and is therefore not a "fishing expedition" contrary to the rules governing post-conviction discovery.

Defendant also claims that the State's reliance on Marshall and Herrerra is misplaced, arguing that those cases support a limited right to post-conviction discovery and are distinguishable; unlike the defendants in Marshall and Herrerra, defendant argues, he submitted a good-faith inquiry that is narrow in scope, not a general request to inspect the State's entire file. And to the extent the State argues defendant's request will result in an administrative burden, defendant maintains records are now digitally stored and readily accessible.

The Innocence Project largely reiterates defendant's arguments. Like defendant, the Innocence Project emphasizes the importance of allowing access to discovery both pre-and post-conviction, citing numerous cases and studies in supporting the contention that Brady violations result in a myriad of wrongful convictions. While recognizing the need for finality, the Innocence

12

Project argues that technological advancements and society's perception of wrongful convictions are relevant considerations in assessing finality in a post-conviction setting.

## III.

Appellate courts "generally defer to a trial court's resolution of a discovery matter, provided its determination is not so wide of the mark or is not 'based on a mistaken understanding of the applicable law.'" State in Interest of A.B., 219 N.J. 542, 554 (2014) (quoting Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 371 (2011)).

This appeal requires the Court to consider defendant's request for discovery, made twenty-five years after his conviction, which the trial court analyzed as a second PCR petition. The Appellate Division found error in that analysis, holding that defendant was merely seeking to obtain what should have been turned over to him automatically under Rule 3:13-3(b)(1)(F) and (G) and that, once the evidence is turned over, the court should then evaluate it under the standard for a motion for a new trial.

## A.

The conflict about the appropriate review standard reflects the extraordinary nature of the motion at issue, which is premised on defendant's claim that, because detectives interviewed Theresa before defendant's trial

13

regarding an unrelated matter involving a business that he owned, the State should be compelled to search its file for evidence that officers interviewed Theresa after production of the Boyle letter. Defendant seeks any records pertaining to the hypothetical second interview of Theresa that he claims is likely to have taken place based on a known first interview of Theresa. Indeed, counsel claimed at oral argument that, because police interviewed Theresa previously, it was obvious detectives would have interviewed her regarding the Boyle letter.

Significantly, however, defendant knew of the first interview before his trial for the murder of Nicholas Mirov. He had, in fact, been provided discovery that included a redacted transcript of that first interview. Defendant therefore had all of the information on which he now predicates his discovery request prior to his trial, and Rule 3:13-3(f) would have provided a ready remedy, had his motion been made at trial. Moreover, defendant could have made the present inquiry at any time since trial, but he failed to raise the issue presented here in either his direct appeal or in his 1999 PCR petition, even though they focused on the Boyle letter.

Defense counsel has yet to explain why a discovery request was not made by defendant's "experienced" trial counsel or any of his subsequent attorneys. Not only has defendant had access since his first trial to every piece

of evidence used to support his 2018 discovery request, but defendant also had every reason nearly thirty years ago to have the same suspicion he holds today -- that investigators spoke to Theresa after production of the Boyle letter. Defendant nevertheless failed to investigate or make any inquiry about the information he now seeks at any stage of his trial, appeal, or application for post-conviction relief.

It is true that, if such a second interview took place, the State would have been obliged to include any record made of it among its other automatic post-indictment materials pursuant to Rule 3:13-3(b)(1)(F) and (G).[7] And, if

---

[7] Rule 3:13-3(b)(1)(F) and (G) provide that the State's post-indictment discovery to defendant "shall . . . include" the

> (F) names, addresses, and birthdates of any persons whom the prosecutor knows to have relevant evidence or information including a designation by the prosecutor as to which of those persons may be called as witnesses; [and]

> (G) record of statements, signed or unsigned, by such persons or by co-defendants which are within the possession, custody or control of the prosecutor and any relevant record of prior conviction of such persons. The prosecutor also shall provide the defendant with transcripts of all electronically recorded co-defendant and witness statements by a date to be determined by the trial judge, except in no event later than 30 days before the trial date set at the pretrial conference, but only if the prosecutor intends to call that co-defendant or witness as a witness at trial.

15

the interview took place and was exculpatory, its disclosure would have been mandatory under both Brady and Rule 3:13-3(b)(1).  See State v. Desir, 245 N.J. 179, 193 (2021).

The continuing duty to disclose such materials imposed by Rule 3:13-3(f), however, ends with a defendant's conviction; that Rule's remedies are explicitly linked to discovery learned to have been withheld "during the course of the proceedings."  See Marshall, 148 N.J. at 268 ("[T]he general discovery obligations contained in the Rules Governing Criminal Practice, see R. 3:13-2 to -4, do not extend to post-conviction proceedings."); cf. Commonwealth v. Williams, 86 A.3d 771, 781-82 (Pa. 2014) ("Brady does not purport to speak to, or govern, the distinct question of the scope of discovery . . . under any state's post-conviction review regime."  (citing Dist. Att'y's Off. for Third Jud. Dist. v. Osborne, 557 U.S. 52, 68-69 (2009))).

Requests for discovery made post-conviction -- even if the requested materials should have been turned over automatically post-indictment -- are therefore not granted automatically under either our Court Rules or Brady. That position is understandable since a defendant seeking post-conviction relief "in most instances will be fully informed of the documentary source of the errors that he brings to the PCR court's attention."  Marshall, 148 N.J. at 270.  Rather, post-verdict discovery requests fall within the discretion of the

trial court: As we held in <u>Marshall</u>, a trial court's inherent power to order discovery extends to post-conviction proceedings "when justice so requires." <u>Id.</u> at 269 (quoting <u>State v. ex rel. W.C.</u>, 85 N.J. 218, 221 (1981)). But courts invoke that discretion "only in the unusual case," <u>id.</u> at 269-70, in recognition of the importance of finality, <u>see id.</u> at 152.

Here, defendant argues that this discovery motion should be analyzed differently because it is a motion in anticipation of a new trial rather than a PCR petition. We therefore review the relevant standards.

B.

1.

PCR is our equivalent of the federal writ of habeas corpus. <u>State v. Jones</u>, 219 N.J. 298, 310 (2014); <u>State v. Preciose</u>, 129 N.J. 451, 459 (1992). "It is a safeguard to ensure that a defendant was not unjustly convicted." <u>State v. Afanador</u>, 151 N.J. 41, 49 (1997). But post-conviction relief is not a substitute for direct appeal; nor is it an opportunity to relitigate a case on the merits. <u>Jones</u>, 219 N.J. at 310 (citing <u>R.</u> 3:22-5). Hence, a defendant is precluded from using "post-conviction relief to assert a new claim that could have been raised on direct appeal." <u>State v. McQuaid</u>, 147 N.J. 464, 483 (1997).

17

After an unsuccessful direct appeal, post-conviction relief is the last opportunity for a defendant to challenge the veracity of a criminal verdict on constitutional grounds. State v. Feaster, 184 N.J. 235, 249 (2005). Indeed, post-conviction relief "is the exclusive means of challenging a judgment" following a criminal conviction, except where our Constitution provides otherwise. R. 3:22-3.

There are also procedural restrictions that apply to PCR applications. Rule 3:22-12(a) explicitly bars petitions not filed within five years of entry of the challenged judgment of conviction, and Rule 3:22-4(a) bars petitions that rely on grounds that could reasonably have been -- but were not -- raised during direct appeal, unless an exception applies. Second or subsequent petitions are barred unless they are filed within one year of the denial of the previous PCR petition, R. 3:22-12(a)(2)(C); one year from the recognition and retroactive application of a newly recognized constitutional right, R. 3:22-12(a)(2)(A); or, as would be relevant to the circumstances presented in this case, one year from the discovery of a factual predicate for relief -- "if that factual predicate could not have been discovered earlier through the exercise of reasonable diligence," R. 3:22-12(a)(2)(B).

Rule 3:22-4(b)(2)(B) adds further detail to the factual predicate requirement; under that Rule, even a timely second or subsequent PCR petition

18

shall be dismissed unless . . . it alleges on its face . . . that the factual predicate for the relief sought could not have been discovered earlier through the exercise of reasonable diligence, and the facts underlying the ground for relief, if proven and viewed in light of the evidence as a whole, would raise a reasonable probability that the relief sought would be granted[.]

Although we may relax procedural roadblocks to avoid fundamental injustice, this Court has repeatedly emphasized that doing so requires balancing the competing interests of finality and fundamental fairness. State v. Martini, 187 N.J. 469, 481 (2006); Marshall, 148 N.J. at 152; see also Preciose, 129 N.J. at 474 ("Judicial enforcement of our procedural rules achieves the important state goals of finality and judicial economy.").

2.

Unlike petitions for post-conviction relief, "[a] motion for new trial based on the ground of newly-discovered evidence may be made at any time." R. 3:20-2.

But like a petition for PCR, the movant seeking a new trial based on newly discovered evidence must demonstrate that the evidence is, indeed, newly discovered; a new trial is warranted only if the evidence is "(1) material to the issue and not merely cumulative or impeaching or contradictory; (2) discovered since the trial and not discoverable by reasonable diligence beforehand; and (3) of the sort that would probably change the jury's verdict if

19

a new trial were granted." State v. Nash, 212 N.J. 518, 549 (2013) (quoting State v. Carter, 85 N.J. 300, 314 (1981)).

As in the PCR context, the concept of reasonable diligence, bearing upon whether evidence is truly newly discovered, is rooted in the idea "that judgments must be accorded a degree of finality." See State v. Ways, 180 N.J. 171, 192 (2004). The newly-discovered evidence requirement "should encourage defendants and attorneys to act with reasonable dispatch in searching for evidence" in anticipation of trial. Ibid.

In Nash, we found that the testimonial evidence of key witnesses who possessed exculpatory evidence was not discoverable through reasonable diligence prior to trial because a gag order had prevented the defense from accessing key witnesses. 212 N.J. at 527, 552-53; see also State v. Behn, 375 N.J. Super. 409, 429 (App. Div. 2005) ("There is no doubt that the information at issue, the results of [bullet lead analysis] studies . . . , was newly discovered since it was not developed until after defendant's trial. Clearly, such new scientific evidence may constitute newly discovered evidence.").

But in Ways, in the absence of a similar external obstacle, we found that the testimony of a witness whose "identity was well known to the defense at trial . . . could have been discovered with reasonable diligence" and therefore did not constitute newly discovered evidence. 180 N.J. at 196; see also State

20

v. Fortin, 464 N.J. Super. 193 (App. Div. 2020) (holding that, with a single exception, the various scientific reports proffered to challenge the reliability of bitemark analysis did not constitute newly discovered evidence for purposes of a motion for a new trial because scientific studies questioning the reliability of bitemark analysis existed at time of trial), certif. denied, 246 N.J. 50 (2021).

C.

Comparison of the PCR petition and new trial motion standards reveals that, although the trial court incorrectly categorized defendant's motion as a second PCR petition, the motion must fail because defendant cannot satisfy the "reasonable diligence" requirement common to both motions. As explained above, defendant's discovery request came decades after defendant learned about the ground upon which his request is based, and defendant failed to take any action upon that knowledge over the years and over the course of judicial proceedings focused on the letter's admissibility.

Nor has defendant made any showing that discovery should be granted in the interest of justice because a record of the hypothetical interview might constitute exculpatory evidence. Although the title of defendant's motion invokes Brady, defendant has not put forward any evidence in support of his claim that the information sought could be exculpatory or material. See State v. Brown, 236 N.J. 497, 518 (2019) (noting that, under Brady, "suppression by

21

the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution") (quoting Brady, 373 U.S. at 88)); Martini, 160 N.J. at 269 (explaining that "[e]vidence is 'material'" for Brady purposes "if there is a 'reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different'" (quoting U.S. v. Bagley, 473 U.S. 667, 682 (1985))).

Simply put, "[w]e would not require a person who is probably innocent to languish in prison because the exculpatory evidence was discoverable and overlooked," Ways, 180 N.J. at 192, but a post-conviction request for even purported Brady materials must make a threshold showing that the requested materials are, in fact, Brady materials, see Martini, 160 N.J. at 268 ("In order to establish a Brady violation, the defendant must show that: (1) the prosecution suppressed evidence; (2) the evidence is favorable to the defense; and (3) the evidence is material."); see also Osborne, 557 U.S. at 68-70 (noting that Brady does not impose post-conviction disclosure requirements and approving as consistent with the requirements of due process Alaska's required threshold showing before post-conviction discovery is granted).

Rule 1:6-6 permits the submission of affidavits in support of motions "based on facts not appearing of record or not judicially noticeable," and case

22

law reveals that such affidavits have been pivotal in post-conviction discovery decisions, see, e.g., Banks v. Dretke, 540 U.S. 668, 682, 689-90 (2004) (holding that the defendant established "cause" in federal habeas corpus proceedings after presenting affidavits of key witnesses possessing material and exculpatory evidence not previously disclosed by the State following direct appeal and state post-conviction proceedings).

In United States v. Velarde, for example, the Tenth Circuit overturned a decision in which the district court denied discovery on the basis that the evidence sought would not be "material" under Brady. See 485 F.3d 553, 664 (10th Cir. 2007). In that case, the defendant had been convicted of sexually abusing a minor "almost entirely on [the victim's] testimony." Id. at 554. The defendant was tried and convicted a second time after his first conviction was vacated due to expert testimony issues. Ibid.

Three years after his second conviction, the defendant filed a motion seeking a new trial based on the government's suppression, before his second trial, of "evidence that was favorable to him and material," namely false accusations of inappropriate touching made by the victim against her teacher and her school's vice principal. Id. at 554-55. The defendant learned of those false accusations and filed a motion for a new trial, claiming a Brady violation had occurred. Id. at 555. He supported his motion with an affidavit by a

23

teacher at the victim's school -- the union representative of the teacher who had been accused by the victim -- in which the representative testified that he had reported the false accusations to an FBI agent before the start of the defendant's second trial.  Ibid.

The district court initially scheduled an evidentiary hearing on the motion but then canceled it after ruling that any evidence about the false accusations would not be admissible.  Id. at 555-58.  The Tenth Circuit vacated the district court's judgment.  Id. at 563.  The circuit court did not hold that the defendant's motion for a new trial should be granted; it held

> only that, on this record, the district court erred in holding that the suppressed evidence was immaterial without first either resolving the disputed question regarding whether the government suppressed information regarding [the victim's] supposed false accusations at school or allowing discovery to determine the nature and veracity of [the victim's] supposed accusations against her teacher and vice principal.  The district court has broad discretion to determine the type and manner of any discovery.
>
> [Ibid.]

Stressing the affidavit proffered by the defendant, and the fact that the victim's "testimony was virtually the only evidence of [the defendant's] guilt," the Tenth Circuit found the case to belong to "the rare class of cases" in which discovery should be permitted on a motion for a new trial.  See id. at 560, 563.

24

Here, rather than proofs, certifications, or affidavits, defendant offers a mere supposition that investigators interviewed Theresa after production of the Boyle letter, without showing or even alleging why the contents of the assumed interview might be "material" for <u>Brady</u> purposes. And the State here produced more evidence of guilt, including defendant's brother's testimony that defendant had confessed to killing Mirov; the brother's testimony that a .32 caliber gun was kept at the family's store; the .32 caliber bullets found in the victim's neck and near where he was shot; the Boyle letter; Michael's testimony about finding the Boyle letter; and an expert's report matching defendant's handwriting to the writing on the letter. In sum, defendant has not made the requisite showing that the requested material should be considered as <u>Brady</u> material.

Under the unusual circumstances presented here, we find defendant's failure to satisfy the requirements of <u>Rule</u> 3:20-2 -- the motion in support of a new trial that would be the ultimate use to which any interview-related discovery would be put -- sufficient to resolve the matter.

Again, there is no freestanding right to post-verdict discovery under our Court Rules, <u>see</u> <u>Marshall</u>, 148 N.J. at 268; <u>R.</u> 3:13-2 to -4, and so analysis of any motion for such discovery must therefore necessarily consider the proposed use to which the discovery would be put, <u>cf.</u> <u>Bracy v. Gramley</u>, 520

25

U.S. 899, 904 (1997) (noting, in the habeas context, that "[b]efore addressing whether petitioner is entitled to discovery . . . to support his judicial-bias claim," the Court had to "first identify the 'essential elements' of that claim" (quoting United States v. Armstrong, 517 U.S. 456, 468 (1996))); see also United States v. Siegelman, 282 F.R.D. 640, 643 n.1 (M.D. Ala. 2012) ("The defendant's motion for discovery is inextricably tied to his motion for a new trial pursuant to Fed. R. Crim. P. 33."); Commonwealth v. Camacho, 36 N.E.3d 533, 544 (Mass. 2015) ("In order to prevail on a posttrial discovery motion, a defendant must demonstrate that it is reasonably likely that such discovery will lead to evidence possibly warranting a new trial."). If it is impossible for defendant to prevail on his ultimate claim for relief -- even should the requested discovery prove favorable to his cause -- then there is no need to separately analyze the discovery request, as the Court of Appeals for the Tenth Circuit held in United States v. Silva-Arzeta, 602 F.3d 1208, 1218-19 (10th Cir. 2010).

In Silva-Arzeta, the circuit court considered the district court's denial of the defendant's "motion for a new trial on the basis of newly discovered evidence" after the second trial in his case. 602 F.3d at 1218. The defendant's motion was predicated on his contention that evidence tampering had occurred between his first and second trials; according to the defense, the baggies

26

introduced at defendant's second trial as having been found in his home were of two sizes, one of which matched a baggie found in his car that contained methamphetamine, whereas none of the baggies presented in evidence at his first trial had matched the baggie found in the car. Id. at 1217-18. Significantly, defense counsel was aware of -- and had even remarked upon -- the alleged baggie discrepancy prior to jury selection in the second trial, but he filed no motion based on suspected tampering and did not question any witnesses about the discrepancy. Id. at 1218. The district court denied the defendant's request for discovery:

> Applying the standard set forth in United States v. Velarde, 485 F.3d 553 (10th Cir. 2007), for postverdict discovery to support a motion for a new trial based on newly discovered evidence, it said that Mr. Silva-Arzeta had not shown that "'further investigation under the court's subpoena power very likely would lead to the discovery of' evidence sufficient to support a motion for a new trial or, at least, a motion for evidentiary hearing on a new trial."
>
> [Ibid.]

The Tenth Circuit "affirm[ed] the district court, but without reference to the Velarde standard," ibid., because

> [t]he time for Mr. Silva-Arzeta to seek evidence regarding tampering was before the verdict was rendered. He did not have the option of awaiting the verdict to determine whether to pursue his inquiry. He

27

could have moved at trial for a continuance, subpoenaed former jurors, or taken other steps to investigate tampering. It is not uncommon for a court to conduct an investigation during trial to determine whether there have been improper communications with jurors. There is no reason why a similar inquiry into evidence tampering could not have been conducted when Mr. Silva-Arzeta's counsel first raised his concerns. He had no additional evidence of tampering when he made his posttrial motion. It is therefore obvious that any evidence he might have acquired after a grant of his posttrial motion could have been obtained before the verdict if he had acted diligently. In other words, no evidence acquired by granting the motion could be considered "newly discovered," so granting the motion would be a useless act.

[Id. at 1219 (emphasis added).]

We similarly find that granting defendant's discovery motion here "would be a useless act" because he cannot possibly satisfy the "reasonable diligence" prong of the standard for a new trial based on newly discovered evidence. Armed with all of the information on which he now bases his motion, defendant failed to take any action to secure the now-requested discovery before his re-trial, during his re-trial, or in the decades since. In sum, although the trial court erred in labeling defendant's motion as a PCR petition, the motion can fare no better under the standard for new trials because, when such a motion is based on "newly discovered evidence," a defendant must show "reasonable diligence."

28

Nevertheless, for completeness we review our jurisprudence governing post-trial discovery motions.

IV.

In Marshall, this Court considered under what standard a request for discovery made in connection with a PCR petition should be evaluated to determine whether a particular case was an "unusual case" in which a post-conviction discovery request should be granted. See 148 N.J. at 270. Defendant challenges the applicability of the Marshall standard in the non-PCR context of his motion for discovery that might support a new trial.

We find defendant's challenge unpersuasive. There is very limited case law addressing motions for discovery in the hope of obtaining evidence that would support the motion for a new trial. And as the Tenth Circuit observed in Velarde, "[t]he case law in this area . . . is obscure." See 485 F.3d at 559. Courts therefore regularly have recourse to cases addressing discovery in the context of "analogous post-conviction proceeding[s]," namely PCR or habeas proceedings. See id. at 560; Siegelman, 282 F.R.D. at 643; cf. Whiteside v. State, 885 N.W.2d 829 (Iowa Ct. App. 2016) ("[A] PCR application based on newly discovered evidence is subject to the same analysis as a motion for new trial based on the same."). We find it appropriate to turn to the standard applied to discovery requests in the PCR setting for guidance in the motion-

29

for-a-new-trial context, given the lack of New Jersey caselaw specific to this circumstance and the "reasonable diligence" requirement shared by the standards. We therefore review this Court's decisions in <u>Marshall</u> and <u>Herrerra</u> and then consider how the standard articulated therein would apply to the circumstances of this case.

A.

In <u>Marshall</u>, the Court considered defendant's request for post-conviction relief alleging that the State had failed to turn over discoverable evidence. 148 N.J. 139. The Court recounted that the State conceded in defendant's direct appeal that the State had breached its pre-trial discovery obligations at a hearing on a motion for mistrial by failing to provide relevant documents. The Court held, however, in deciding the mistrial motion, that the undisclosed items were not "material to defendant's guilt or punishment" and that the State's nondisclosures therefore did not warrant reversal of defendant's convictions or sentence. <u>Marshall</u>, 148 N.J. at 139 (discussing <u>State v. Marshall</u> 123 N.J. 1, 133-34 (1991)).

After exhausting his direct appeals, the defendant filed for post-conviction relief alleging that the State failed to turn over discoverable evidence. <u>Ibid.</u> Analogous to defendant's contention here -- that it is reasonable to conclude that detectives interviewed Theresa about the Boyle

30

letter -- the defendant in <u>Marshall</u> argued that, in light of the State's concession on appeal, it was reasonable to conclude that the State possessed but failed to disclose additional discovery. The defendant then moved to inspect the State's entire file, claiming that, because he had shown the State failed to comply with its pretrial discovery obligations, he was entitled to broad post-conviction discovery. <u>Id.</u> at 268.

This Court rejected defendant's contentions, finding that "the general discovery obligations contained in the <u>Rules Governing Criminal Practice</u>, <u>see</u> <u>R.</u> 3:13-2 to -4, do not extend to post-conviction proceedings." <u>Ibid.</u> We also found no constitutional basis to allow the defendant's inspection of the State's file. <u>Ibid.</u> We observed that, notwithstanding the State's obligation under <u>Brady</u> and the Due Process Clause to provide a defendant with exculpatory material evidence in the State's possession, the State is not required post-conviction to allow defendants to "'fish' through official files for belated grounds of attack on the judgment, or to confirm mere speculation or hope that a basis for collateral relief may exist." <u>Id.</u> at 270 (quoting <u>People v. Gonzalez</u>, 800 P.2d 1159, 1205 (Cal. 1990)). The Court held, however, that "where a defendant presents the PCR court with <u>good cause</u> to order the State to supply the defendant with discovery that is relevant to the defendant's case and not

31

privileged, the court has the discretionary authority to grant relief." Ibid. (emphasis added).

"[A]nticipat[ing] that only in the unusual case will a PCR court invoke its inherent right to compel discovery," the Marshall court did not define the "good cause" standard it adopted. Ibid. Though Marshall did not define good cause within the context of post-conviction discovery, other jurisdictions have observed "that a showing of good cause entails more than 'a generic demand for potentially exculpatory evidence.'" Commonwealth v. Williams, 86 A.3d 771, 786 (Pa. 2014) (quoting Commonwealth v. Bryant, 855 A.2d 726, 750 (Pa. 2004)); accord Commonwealth v. Carson, 590 A.2d 220, 261 (Pa. 2006) (noting that "a PCRA petitioner is not entitled to discovery where he has not shown the existence of requested documents, as speculation that requested documents will uncover exculpatory evidence" is insufficient to warrant post-conviction discovery (citation omitted)); State v. Turner, 976 So.2d 508, 511 (Ala. Crim. App. 2007) (emphasizing that post-conviction discovery requires a showing of good cause and is not automatic; "a petitioner must allege facts that, if proved, would entitled him to relief" (quoting Ex parte Land, 775 So. 2d 847, 852 (Ala. 2000) (citing, in turn, Marshall, 148 N.J. at 89), overruled in other part by State v. Martin, 69 So. 3d 94, 97 (Ala. 2011))); cf. Ghandi v. Cespedes, 390 N.J. Super. 193, 196 (App. Div. 2007) (explaining, in the

32

context of civil litigation, that "'[g]ood cause' is an amorphous term, that is, it 'is difficult of precise delineation. Its application requires the exercise of sound discretion in light of the facts and circumstances of the particular case considered in the context of the purposes of the Court Rule being applied'" (quoting Del. Valley Wholesale Florist, Inc. v. Addalia, 349 N.J. Super. 228, 232 (App. Div. 2002))).

Without expressly invoking the good cause standard, the Court reached a similar conclusion in Herrerra. In that case, the defendants sought, in a post-conviction setting, to investigate evidence of racial profiling by compelling the State to produce the arresting officer's personnel file, without presenting evidence that the motor vehicle stop leading to the defendants' arrest on narcotics and attempted murder charges was racially motivated. 211 N.J. at 313. Specifically, the defendants requested data concerning the officer's traffic stops and discovery "relevant" to the State Police practice of racial profiling. Id. at 329. In assessing the defendants' request, we repeated that post-conviction discovery is permitted "only in the unusual case." Id. at 328 (citing Marshall, 148 N.J. at 270). Mindful of our decision in Marshall, we rejected the defendants' application because they failed to support their discovery request with any facts that they were racially targeted. Id. at 342.

B.

Against that backdrop, we consider whether defendant establishes good cause for his discovery motion, which seeks to require the State -- nearly thirty years after defendant learned of the facts he now argues to constitute good cause -- to search its file for documents defendant claims might exist and might be material or exculpatory. The trial court said no; the Appellate Division disagreed. We agree with the trial court. This case is not the "unusual case" we contemplated in Marshall.

Like the defendants in Marshall and Herrerra, defendant claims here that the discovery sought may enable a motion for a new trial based upon evidence "discovered since the trial and not discoverable by reasonable diligence beforehand." Nash, 212 N.J. at 549 (quoting Carter, 85 N.J. at 314 (1981)). But defendant knew not only about the Boyle letter but also that Theresa had been interviewed about an unrelated crime involving defendant decades before filing his motion seeking "any and all notes, reports, statements or other type of writings memorializing any interviews, talks, discussions, etc., with Theresa Boyle." And, although the discovery sought here is far more limited than in Marshall and Herrerra, the letter's admissibility was heavily litigated, the subject of an interlocutory appeal, defendant's direct appeal, and defendant's first PCR. Notwithstanding the Boyle letter's role in defendant's conviction,

34

defendant has failed to support his discovery request with any explanation of his failure to raise the present issue before the trial court, during direct appeal, or at the time of his first PCR.

In addition to failing to explain his delay or offer any facts to support his discovery request, defendant has made virtually no effort to investigate his claim that detectives spoke to Theresa after disclosure of the Boyle letter. Indeed, during the twenty-six-years since the letter's production, defendant sent only a single unanswered certified letter to Theresa, who did not cooperate in her then-husband's defense; counsel never followed up by mail, phone, or in person, and did not attempt to reach the prosecutor who tried defendant's case or investigating detectives.

As the trial court aptly concluded, this might be a different case had defendant presented a certification that detectives interviewed Theresa after production of the Boyle letter. In the absence of such evidence, however, and based on the circumstances in this case, defendant fails to make the necessary showing of good cause under Marshall. Without support, defendant's argument is precisely the "mere speculation or hope" for a basis of collateral attack that we rejected in Marshall, 148 N.J. at 270; see also Strickler v. Greene, 527 U.S. 263, 286 (1999) ("Mere speculation that some exculpatory

35

material may have been withheld is unlikely to establish good cause for a discovery request on collateral review.").

In Herrerra, moreover, we observed that given the stage of the proceedings -- "nearly twenty years after the offense and almost seventeen years since the jury's verdict" -- the defendants would face the additional challenge of showing that any newly discovered evidence "would probably change the jury's verdict if a new trial were granted." 211 N.J. at 343 (quoting Ways, 180 N.J. at 187). That observation applies with greater force here -- forty-six years after the offense and twenty-seven years since the jury's verdict. And, as stressed in Herrerra, there were "strong corroborative proofs" in this record. See ibid. Here, the evidence at trial included: testimony by Michael about his discovery of the Boyle letter; the Boyle letter; the expert testimony that defendant authored the Boyle letter; the testimony of defendant's brother that his family kept a .32 caliber handgun in the family store where defendant worked and that defendant confessed to firing multiple shots into the victim; and the .32 caliber bullets found lodged in the victim's neck and the base of the tree where the victim's remains were found covered in part by a tarp.

The length of time since defendant's conviction and the proofs at trial belie any notion that defendant could demonstrate under Rule 3:22-4(b) that

36

the evidence he seeks would "raise a reasonable probability" that a motion for a new trial would be granted. Accordingly, we cannot conclude that, if the evidence sought by defendant exists, it "would probably change the jury's verdict if a new trial were granted." Herrerra, 211 N.J. at 344 (quoting Ways, 180 N.J. at 187).

In sum everything relied on by defendant in this appeal has been known to him for more than twenty-five years, and the discovery sought could have been requested a quarter century ago. Defendant offers no explanation for his delay and has offered no evidential support for the existence -- let alone the exculpatory nature -- of the evidence he belatedly seeks that could cast doubt upon the jury's verdict, which was supported by the record before it. Thus, the trial court appropriately exercised its discretion in denying defendant's request for relief. Balancing the competing interests of finality and fundamental fairness requires denial of defendant's motion. Martini, 187 N.J. at 481. We agree with the trial court's conclusion that defendant's claims are "purely speculative" and are premised on defendant's "subjective belief that something exists." We will therefore not require the State to "fish through [its file] for belated grounds of attack" of defendant's conviction. Marshall, 148 N.J. at 270 ("PCR 'is not a device for investigating possible claims, but a means for vindicating actual claims.'" (quoting Gonzalez, 800 P.2d at 1260)). The trial

court's decision to deny defendant's request was thus not "a decision 'made without a rational explanation'" amounting to an abuse of discretion. <u>Flagg v. Essex Cnty. Prosecutor</u>, 171 N.J. 561, 571 (2002) (quoting <u>Achacoso-Sanchez v. INS</u>, 779 F.2d 1260, 1265 (7th Cir. 1985)).

V.

For the reasons set forth above, the judgment of the Appellate Division is reversed.

JUSTICES PATTERSON, FERNANDEZ-VINA, and PIERRE-LOUIS join in JUSTICE SOLOMON's opinion. JUSTICE ALBIN filed a dissent, in which CHIEF JUSTICE RABNER and JUSTICE LaVECCHIA join.

State of New Jersey,

Plaintiff-Appellant,

v.

Craig Szemple,

Defendant-Respondent.

JUSTICE ALBIN, dissenting.

"To advance the goal of providing fair and just criminal trials," this Court has "adopted an open-file approach to pretrial discovery in criminal matters post-indictment." State v. Scoles, 214 N.J. 236, 252 (2013). Disclosure of relevant evidence "promot[es] the search for truth." Id. at 251. The opportunity for post-conviction relief under our Court Rules is an acknowledgment that trials are sometimes flawed and that the search for truth and the quest to ferret out error are not extinguished by a conviction.

Even the best system of criminal justice is imperfect, and sometimes the outcome will be a wrongful conviction. Although we cannot correct all wrongful convictions, we can correct some. A system that discloses relevant discovery in a post-conviction setting can bring to light some injustices. If

1

discovery is important to the revelation of truth before a criminal trial, it is not any less so in a post-conviction setting.

The issue in the case before us is not about the finality of judgments. Defendant has not filed a petition for post-conviction relief or a motion for a new trial based on newly discovered evidence. At this point, the issue is simply whether, in this post-conviction setting, defendant may have access to a critical piece of evidence -- if it exists -- that either the State already turned over to him as part of its original discovery obligation under Rule 3:13-3 or failed to turn over to him in violation of that discovery rule. The majority's thirty-eight-page opinion does not explain how the disclosure of the evidence that defendant seeks would burden the State or poison the well of justice.

Defense counsel did not seek the entirety of the State's file or pursue a fishing expedition. Defense counsel made a targeted, reasonable request for post-conviction discovery -- the type of discovery request of which we expressly approved in State v. Marshall. See 148 N.J. 89, 269-71 (1997). Indeed, a court has "the inherent power" to grant discovery to a criminal defendant after a final judgment of conviction "when justice so requires." Id. at 269 (quoting State in Interest of W.C., 85 N.J. 218, 221 (1981)).

Here, defendant presented "good cause" for the grant of his discovery request. See id. at 270. The discovery request placed a minimal burden on the

State.  Yet, the Morris County Prosecutor's Office refused to make any effort to respond to the request -- and was unwilling to even lift the lid of a box in storage to view its contents.  In addressing this Court, defense counsel stated that this was the first instance in his forty-five-year career where a prosecutor's office stonewalled such a simple, straightforward discovery request.

To be sure, the principle at issue transcends the case of Craig Szemple.  A system of post-conviction relief cannot fulfill its true purpose if reasonable, relevant, and non-burdensome requests for discovery can be thwarted by a prosecutor's office intent on keeping from view discovery that was or should have been available pretrial.  See R. 3:13-3(b)(1).  Our system of justice should have nothing to fear from the dissemination of relevant information to the defense.  Although I part with the Appellate Division's wholesale application of our pretrial discovery rules in the post-conviction setting, I agree with its conclusion that granting the particularized request for discovery in this case was clearly consistent with our jurisprudence.

I therefore respectfully dissent from the majority's denial of defendant's discovery request.

I.

A.

In 1975, Nicholas Mirov disappeared. Four months later, police discovered a decomposed skeleton in the woods of Mount Olive Township. Investigators did not identify the remains as Mirov's until 1991, after one of defendant's brothers volunteered to the police that defendant had confessed to him -- back in 1975 -- to killing Mirov.

In December 1991, defendant was indicted for Mirov's murder. After defendant's trial began in June 1992, defendant's father-in-law, Michael Boyle, presented to the prosecutor's office a letter purportedly written by defendant, admitting to a murder. Boyle claimed that he discovered the unsigned letter in April 1991, sticking out of a box, while helping his daughter -- defendant's then-wife, Theresa -- move out of the marital home. Boyle believed that the incriminating letter was written by defendant to Theresa. The letter began, "[d]earest companion and trusted (new) wife."

According to Boyle, after finding the letter, he hid it, without telling his daughter. He waited over a year to disclose the letter that he believed was a confession to a murder because, he claimed, his ex-wife checked with an attorney who told her that the prosecution had sufficient evidence to convict

4

defendant. That attorney, however, testified that he never had such a conversation with Boyle's ex-wife.

Defendant's first trial ended in a mistrial. When he was re-tried in 1994, the State introduced the letter as a key piece of evidence, arguing that in the letter defendant confided to his wife that he had murdered Mirov. The State, however, did not call Theresa as a witness. Instead, the State relied on a handwriting expert who opined that the letter was written by defendant. The State also presented the testimony of one of defendant's brothers, who asserted that defendant had confessed to him in 1975 that he had murdered Mirov.

Defendant took the stand and denied any involvement in Mirov's death or writing the confession letter to Theresa. He testified that his father made him the "heir apparent" to the family business and that the letter was likely manufactured by his brothers in a plot to frame him so that they could gain his share of his father's inheritance.

The jury convicted defendant.

Whether investigators had interviewed Theresa about the letter allegedly written to her or whether the prosecutor's office withheld discovery on that subject was not an issue raised on defendant's direct appeal or in his post-conviction relief (PCR) proceeding.

5

B.

In 2016, defendant's new post-conviction counsel requested from the Morris County Prosecutor's Office discovery of any reports memorializing any interview that investigators conducted of Theresa regarding the confession letter allegedly written to her. Certainly, an interview of -- or attempt to interview -- Theresa about the authenticity of the letter would have been a natural step in the course of a murder investigation. Indeed, in December 1991, investigators from the Prosecutor's Office interviewed Theresa in a matter involving defendant that was unrelated to the confession letter.

Some of the questions arising from defendant's inquiry are self-evident. Is it reasonable to believe that, six months after the Morris County Prosecutor's Office interviewed Theresa and after her father presented to that Office a purported confession letter written to her, investigators made no attempt to ask her whether defendant gave her the letter but rather opted to hire a handwriting expert to establish the letter's authenticity? If investigators interviewed Theresa, did she say whether she received the letter, whether it was written by defendant, and whether she placed the letter in the box where her father purportedly found it? Or, did she say that letter was a fake? Those questions are relevant to the credibility of defendant's trial testimony that the letter was a fabrication.

6

Defendant's counsel wrote to the Morris County Prosecutor's Office the following:

> My request is simple . . . , if Theresa Boyle Szemple was not interviewed by your office concerning the letter, which was the foundation of the State's case against Mr. Szemple, you can simply write to me representing that she was not interviewed and if she was interviewed you can respond and provide me with copies of her interviews. . . .
>
> My request of your office is specific, it is limited to interviews your office may have had with Theresa Boyle Szemple after December 9, 1991 and the disclosure by her father of a letter the defendant allegedly wrote to her.[1]

The Morris County assistant prosecutor who received defense counsel's letter refused to look for or produce the documents identified in the discovery request or to answer whether the documents existed. At oral argument before this Court, the prosecutor admitted, "I have not looked in the boxes" and therefore could <u>not</u> assure this Court that "there is no report with exculpatory information."

To be clear, defendant has not filed a petition for post-conviction relief or a motion for a new trial. Rather, he only seeks relevant evidence, to which

---

[1] Defendant's counsel also mailed Theresa a letter in an attempt to secure information from her. She signed the return receipt but declined to respond.

7

he was entitled at trial under our discovery rules, for the purpose of determining whether he has a basis to do so. We have not been asked to pass on the potential merits of an unfiled post-conviction relief application -- a point that consumes much of the majority's opinion.

## II.

## A.

The purpose of New Jersey's broad pretrial discovery rules, permitting the defense access to all relevant evidence in the prosecutor's file, is to further the ascertainment of truth and ensure the guarantee of a fair trial. See State v. Hernandez, 225 N.J. 451, 453 (2016) ("This open-file approach is intended to ensure fair and just trials."); see also State in Interest of A.B., 219 N.J. 542, 556 (2014); Scoles, 214 N.J. at 251-52; R. 3:13-3. The prosecutor is not an advocate for a partisan cause; the prosecutor's "overriding duty is to do justice." State v. Garcia, 245 N.J. 412, 418 (2021). One of the premises of the "open-file" approach is that the prosecutor has nothing to hide -- no reason to withhold or fear the dissemination of relevant information mandated by our discovery rules. See Banks v. Dretke, 540 U.S. 668, 696 (2004) (noting, in the context of undisclosed Brady[2] material, that a discovery rule where the

---

[2] Brady v. Maryland, 373 U.S. 83 (1963).

8

"'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process").

Clearly, if the Morris County Prosecutor's Office interviewed Theresa about the purported confession letter and memorialized the interview in writing or electronically, that Office was required to disclose the interview to the defense in discovery. See R. 3:13-3(b)(1) (mandating the disclosure of any "record of statements" by "any persons whom the prosecutor knows to have relevant evidence or information" as well as "exculpatory information or material").

The rules governing pretrial discovery do not apply wholesale to the post-conviction stage. See R. 3:13-3(b). After a defendant's conviction, assuming the State strictly complied with the discovery rules, a defendant should have a mirror-image of the State's file (minus privileged information). A defendant ordinarily has no reason to access the State's file unless his own file has been lost or the State has withheld relevant evidence, either inadvertently or purposely.

Even in the absence "of a Court Rule or constitutional mandate," our "courts have 'the inherent power to order discovery'" in post-conviction proceedings in the interests of justice. Marshall, 148 N.J. at 269 (quoting W.C., 85 N.J. at 221). In Marshall, a capital murder case, we specifically

9

recognized the right of a defendant to secure relevant discovery -- based on a particularized request -- in the post-conviction stage. See id. at 268-71. In that case, we were "not unmindful of the State's failure to comply fully with its pretrial discovery obligations." Id. at 271. We stated that when "a defendant presents the PCR court with good cause to order the State to supply the defendant with discovery that is relevant to the defendant's case and not privileged," the discovery request may be granted. Id. at 270 (emphasis added). A court may even "choose to view the documents in camera before determining whether to issue the requested discovery order," protecting any interest the State may have in confidentiality. See id. at 271.

In Marshall, we "endorse[d]" the procedure employed by the PCR court, which "permitted [the defendant] to make requests for specific items and ordered the State to turn over those items that were relevant and not work product." Ibid. (emphasis added). Through that "specific-request procedure, [the] defendant received from the State approximately one hundred documents." Id. at 140. We also approved of the PCR court's rejection of the defendant's overbroad request "to inspect the State's entire file." Id. at 271. Even so, we held that "[i]f the PCR court had concluded that the State's nondisclosures had been willful, it would have been within that court's

10

authority to grant defendant's motion to inspect the entirety of the State's file."

Ibid.

In the case before us, defendant does not seek to review the State's entire file but at most a few documents, if they exist.

## B.

The post-conviction-relief process "is a defendant's last chance to challenge the 'fairness and reliability of a criminal verdict in our state system.'" State v. Nash, 212 N.J. 518, 540 (2013) (quoting State v. Feaster, 184 N.J. 235, 249 (2005)). In that process, a defendant must be given "a meaningful opportunity to root [error] out" that may have "led to a miscarriage of justice in an earlier trial." Ibid. In certain instances, that "meaningful opportunity" will be meaningless unless the defendant has access to post-conviction discovery -- discovery that was withheld before or during trial. Providing relevant discovery is not the cause of miscarriages of justice.

The passage of time does not bar a court from ordering the disclosure of relevant evidence withheld from the defense that may shed light on a flawed trial process. "[O]ur courts are not powerless to correct a fundamental injustice," however long ago it may have occurred. Id. at 547; see also State v. Ways, 180 N.J. 171, 197 (2004) ("[T]he passage of time is an insufficient reason not to correct an injustice.").

11

In <u>Nash</u>, we overturned a ten-year-old conviction based on a defendant's post-conviction claim, despite multiple procedural defects, because to do otherwise would have perpetuated a wrongful conviction. 212 N.J. at 545-48, 555. Similarly, in <u>Ways</u>, we explained that a defendant's failure to satisfy the "reasonable diligence" prong of the test for newly discovered evidence would not stand as a bar to relief because "[w]e would not require a person who is probably innocent to languish in prison because the exculpatory evidence was discoverable and overlooked by a less than reasonably diligent attorney." 180 N.J. at 192.

Whether a flawed conviction is caused by the State's failure to uphold its discovery obligations or a defense attorney's ineffectiveness will matter little to a wrongly convicted defendant. Here, defendant does not seek relief based on newly discovered evidence or through a post-conviction relief petition. He cannot because the prosecutor has barred his access to the information that might form the basis for a claim. Our jurisprudence does not command that we uphold the prosecutor's arbitrary decision to deny defendant access to potentially relevant information -- a decision that thwarts defendant's ability to argue a basis for relief.

## III.

The confession letter allegedly written by defendant was perhaps the most important piece of evidence introduced at trial. Defendant has made a specific and targeted request for discovery, which, if it exists, may encompass no more than a couple of pages of an investigator's report or a transcript. It is precisely the type of request of which we approved in Marshall. The Morris County Prosecutor's Office knows or should know whether its investigators interviewed defendant's then-wife, Theresa, about the confession letter purportedly written by defendant. If investigators did interview Theresa, then the Prosecutor's Office knows or should know whether she received the letter, whether she authenticated the letter, or whether she described the letter as a fake. If Theresa gave the Prosecutor's Office information that directly conflicted with the testimony of her father and the State's handwriting expert, defendant has a right to that discovery -- even if the information has been withheld for decades.

In accordance with Marshall, defendant has presented "good cause" for the entry of an order requiring the Prosecutor's Office to respond to the limited request for discovery. The majority's denial of relief to defendant cannot be squared with Marshall, our jurisprudence, or fundamental notions of justice.

I therefore respectfully dissent.

13